THE TORGORM.

CHAMBERLAIN v. THE TORGORM.

*(District Court, D. South Carolina.   September 25, 1891.)*

1. SHIPPING—BILL OF LADING—NOTICE.
   Certain cotton was delivered to a railroad company under a through bill of lading to Germany, the bill stating that it was to be delivered at Charleston, "to the ship T., or to some other steam-ship company or line, or vessels chartered thereby." *Held*, that this bill did not constitute notice to the owner or the railroad that the T. was under a charter-party, and, in the absence of actual notice, the railroad company was not bound to accept from her a bill of lading with the additional qualification, "Other conditions as per charter-party."

2. SAME—POSSESSION OF CARRIER—RIGHT TO SUE.
   The cotton having been placed on board the T. immediately on its arrival, according to the usage of the port, the railroad company, by virtue of its right to possession as bailee, could maintain a libel against the vessel to recover the goods upon the master's refusal to sign the bill of lading except with the additional qualification.

In Admiralty.   Libel by Daniel H. Chamberlain, as receiver of the South Carolina Railway Company, against the British steam-ship Torgorm, to recover possession of 52 bales of cotton.   Decree for libelant.

*I. N. Nathans, Mitchell & Smith,* and *Brawley & Barnwell,* for libelant.

*I. P. K. Bryan,* for claimant.

SIMONTON, J.   In April last, B. B. Ford & Co. shipped from Atlanta to Bremen, in Germany, 52 bales of cotton, marked "S. A. S. A."   The cotton was delivered to the Georgia Railroad Company, and was carried under a through bill of lading.   The words of this bill bearing upon the issues of this case are:

"To be transported by the Georgia Railroad Company to its station at Augusta, Ga., and there to be delivered to the next connecting rail or water carrier, being lightered, ferried, or carted at owner's own risk, if necessary; and thence to be transported by such connecting carrier or carriers via the port of Charleston, South Carolina, to the port of ———, and there to be delivered, being lightered, ferried, or carted at owner's risk, to the ship Torgorm, or some other steam-ship company or line, or to vessels chartered thereby; to be transported by such steam-ship company, or by steamer or steamers of such company or line or charterer to the port of Bremen, Germany, there to be delivered unto order, or to his or her assigns."

The cotton reached Augusta, and came into the possession, under the terms of the bill of lading, of the South Carolina Railway Company, of which libelant is receiver.   It was brought to Charleston, and was deliv-

ered by the libelant to the Torgorm via the East Shore Terminal Company, whose track connects the depot of libelant with the dock at which the Torgorm was lying. As soon as the cotton reached the side of the Torgorm it was put on board, and in a very short time thereafter she hauled out into the stream. The mate's receipts given for the cotton on delivery stated that it was received "subject to the conditions of the charter-party." When the clerk of the East Shore Terminal Company handed these receipts to the agent of the South Carolina Railway Company, he took them to the office of the ship's broker, in order to have them exchanged for master's receipts or bills of lading. He prepared himself with bills made out in the usual form,—clean bills, excepting that across their face were words used in the through bill, "Railroad copy not negotiable." The master refused to sign any receipt or bill of lading unless these words were first inserted: "Other conditions as per charter-party." The libelant positively refused to consent to this, and the master persisted in requiring it. The libelant thereupon demanded the redelivery of the cotton. This being refused, this libel was filed. The shippers of the cotton, as well as the libelant and his agents, were ignorant of the existence of any charter-party between the shippers and any one else and the Torgorm. Nor did they have any other reason to believe that she was not a general ship, save such as the through bill of lading disclosed. The libel seeks the redelivery of these 52 bales. The answer sets up these positions: That the Torgorm took in her cargo, including these 52 bales, under a charter-party with the Charleston Exporting & Shipping Company, of which William Fatman is manager; that the shippers of this cotton were aware of this charter-party at and before the date of the delivery of the cotton to the Torgorm; that libelant is neither the owner nor the shipper of the cotton.

The shipper of the cotton denied all actual knowledge of any charter-party, or any knowledge except such as the bill of lading disclosed. On receiving the bill he negotiated a draft on the cotton, and indorsed and attached the bill to it. We have to deal with the rights of the libelant. His rights are measured by his duties. His duties are fixed and defined by the through bill of lading. His obligations are to the holder of this bill, made to order, and negotiated. Any variation of this contract would be at his peril. Under the bill of lading he undertook to carry the cotton from Augusta, and to deliver it to the Torgorm, another carrier; to deliver it precisely as he received it,—that is to say, under the terms of the bill of lading, and none other. The master of the Torgorm proposed to insert the words, "Other conditions as per charter-party." If the through bill of lading—the contract under which libelant delivered and the Torgorm received this cotton—already contained these words or their equivalent, the demand of the master was unnecessary. If it did not, then the master had no right to demand, the libelant had no right to make, any change in the terms of the contract. The learned counsel for the respondent, whose arguments command and receive the careful consideration of the court, insists that the bill of lading gives notice of a charter-party. The language has been quoted. The

cotton is to be delivered primarily to the Torgorm, but, if not delivered to the Torgorm, then to some other steam-ship or company, or (another alternative) to vessels chartered thereby, to be transported by the mode selected,—that is, either by the Torgorm, or by steamers of a line selected in lieu of her; or if neither of these be done, then by the charter of other vessels. It is clear that a charter is not contemplated except upon the contingency that the delivery is not to the Torgorm. Now, the fact being established that the libelant himself and his agents had no knowledge of the existence of a charter-party, and the through of lading did not put him on the inquiry, if he had inserted the words demanded by the master he would have added a new condition to the contract of carriage. This he had not and could not have had any right to do. · He was entitled on delivery to a simple declaration of that fact. He could not have demanded more. He could not be compelled to take less than this. It was urged with great force that this cotton was really the property of William Fatman, who had made the charter-party for his company. It was more than suggested that this suit was a skillful device, to protect him from a just claim. Assuming that this be so, (it is due to Mr. Fatman to say that the evidence does not sustain it,) it cannot affect the right of libelant. If there be any claim on the part of the ship against the charterer, the master cannot force libelant into the controversy, or make him his instrument in enforcing his claim. With the cotton in his possession, he could enforce any lien he may have had. He did not need any new condition inserted in the contract by the libelant. Such being the right of the libelant, has he taken the proper course of securing it? He is not the shipper, nor is he the owner,—the absolute owner,—of the cotton. But he is the bailee, with a qualified ownership, and intrusted with the possession for the purpose of making delivery according to the bill of lading. Until so delivered, he can claim the possession of the cotton, and maintain an action for it. · If the cotton went out of his possession by fraud or mistake, the possession would be restored to him. The libelant would not have delivered this cotton if the conditions insisted upon by the master had been made known to him in advance. He cannot now be prevented from regaining possession, when it is sought to interpolate these conditions, after a delivery made in good faith, and according to the usage of the port. *Peek* v. *Larsen*, L. R. 12 Eq. 378; Macl. Shipp. 352; Story, Ag. § 398; Add. Torts, p. 562, § 540; *The W. A. Morrell*, 27 Fed. Rep. 570. The libelant is entitled to a decree. It has been stated by counsel for respondent, however, that pending this suit the cotton in question has reached Bremen, and has been delivered to and accepted by the holder of the through bill of lading. This being so, it will protect libelant, and will certainly diminish the money claim. Let a reference be held, in which the inquiry will be as to the fact, circumstances, and terms of this delivery.